**SO ORDERED,**

**Judge Katharine M. Samson**
**United States Bankruptcy Judge**
**Date Signed: September 30, 2026**

**The Order of the Court is set forth below. The docket reflects the date entered.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**

| | |
|---|---|
| **IN RE: WALTER TAPLIN** | **CASE NO. 24-00505-KMS** |
| **DEBTOR** | **CHAPTER 13** |
| **WALTER TAPLIN** | **PLAINTIFF** |
| **V.** | **ADV. PROC. NO. 25-00019-KMS** |
| **NEWREZ LLC D/B/A SHELLPOINT MORTGAGE SERVICING** | **DEFENDANT** |

**ORDER AWARDING DAMAGES AND**
**CANCELLING DEBT AND DEED OF TRUST**

On October 27, 2025, the Court granted Plaintiff Walter Taplin's Motion for Default Judgment, determining that Taplin was entitled to judgment against Defendant NewRez LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint"). Adv. Dkt. No. 14. A hearing to determine damages was conducted on January 29, 2026. Adv. Dkt. Nos. 19, 22. At the Court's direction, Taplin filed a post-hearing brief in support of his request for damages. Adv. Dkt. Nos. 26, 29. The Court determines that compensatory damages of $10,000, punitive damagees of $25,000, and attorney fees of $12,300 should be awarded to Taplin. The Court also finds that the debt to Shellpoint is paid in full and therefore the Deed of Trust should be cancelled.

## *I. Jurisdiction*

This Court has jurisdiction over the parties to and the subject matter of this proceeding under 28 U.S.C. §§ 1334 and 157. The parties have consented, either expressly or impliedly, to the bankruptcy court's jurisdiction to enter final orders and judgments on any non-core matters.

### *A. Title 11 cases are referred to bankruptcy judges.*

Under 28 U.S.C. § 1334, "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). "Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). In the Southern District of Mississippi, "[a]ll cases under Title 11 and all civil proceedings arising under Title 11 or arising in or related to cases under Title 11 are referred to the bankruptcy judges of this District pursuant to 28 U.S.C. § 157(a)." L.U. Civ. R. 83.6.

And "[t]he district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction [] of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(e)(1).

#### *1. Bankruptcy judges may enter final orders in core proceedings.*

"Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. § 157(b)(1).

#### *2. Bankruptcy judges may enter final orders in non-core proceedings by consent of the parties, whether express or implied.*

Final orders or judgments in non-core proceedings are entered by the district court, unless consented to by the parties. Procedurally:

> (c)(1) A bankruptcy judge may hear a proceeding that is *not a core proceeding* but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.
>
> (2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the *consent* of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

28 U.S.C. § 157(c) (emphasis added). And, as to personal injury torts, "[t]he district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending, or in the district court in the district in which the claim arose, as determined by the district court in which the bankruptcy case is pending." 28 U.S.C. § 157(b)(5).

Bankruptcy litigants may waive their right to Article III adjudication, including claims for personal injury torts, through implied consent if it is "knowing and voluntary." *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 684-85 (2015) (noting that key inquiry is whether litigant was made aware of need for consent and right to refuse it); *see also Saenz v. Gomez (In re Saenz)*, 899 F.3d 384, 391 (5th Cir. 2018) (recognizing that bankruptcy litigant's consent to waive right to Article III adjudication may be express or implied so long as it is knowing and voluntary); *see also In re Residential Cap., LLC*, 536 B.R. 566, 571 (Bankr. S.D.N.Y. 2015) ("The Supreme Court has held—though most overlook this particular holding—that section 157(b)(5) is *not* jurisdictional and *the parties may consent* to the trial of personal injury and wrongful death claims in the bankruptcy court." (citing *Stern v. Marshall*, 546 U.S. 462, 479 (2011))) (emphasis added and in original).

***B. The parties consented to bankruptcy court jurisdiction on state law claims.***

The default judgment against Shellpoint established liability on Taplin's state law causes of action for breach of contract,[1] intentional infliction of emotional distress, negligence, and negligent infliction of emotional distress. Adv. Dkt. Nos. 1, 14.

***1. Taplin consented to bankruptcy court jurisdiction.***

Taplin consented to the bankruptcy court's jurisdiction in his complaint. Bankruptcy Rule 7008 requires that "[i]n an adversary proceeding before a bankruptcy court, a complaint . . . must state whether the pleader does or does not consent to the entry of final orders or judgment by the bankruptcy court." Fed. R. Bankr. 7008. And, under Local Rule 7008-1, "[i]f no such statement is included, the pleader shall have waived the right to contest the authority of the court to enter final orders or judgment." Miss. Bankr. L.R. 7008-1. The complaint states that the Court has jurisdiction under 28 U.S.C. §§ 157 and 1334, and the matter is a core proceeding under 28 U.S.C. § 157(b), thereby confirming Taplin's consent to entry of a final order or judgment. *See* Adv. Dkt. No. 1 at 1.

***2. Shellpoint waived the right to contest the authority of the bankruptcy court to enter a final default judgment by failing to respond to the summons.***

The summons issued on the adversary complaint expressly provided Shellpoint with notice that failure to respond would constitute consent to entry of a final judgment by default by the bankruptcy court. *See* Summons, Adv. Dkt. No. 4 at 1 (**"IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT**

[1] Taplin's breach of contract claim impacts Shellpoint's proof of claim and its lien on property of the estate and may be considered core under 28 U.S.C. § 157(b)(2)(B) (allowance or disallowance of claims against the estate), (K) (determinations of the validity, extent, or priority of liens), (O) (proceedings affecting the adjustment of the debtor-creditor relationship), or 28 U.S.C. § 1334(e)(1) (bankruptcy court has exclusive jurisdiction over property of estate).

**MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**")[2] (capitalization and bolding in original). The Certificate of Service for the summons certifies that Shellpoint's registered agent for service of process was served, by personal service, with the summons and a copy of the complaint on September 16, 2025. Adv. Dkt. No. 7. "Numerous bankruptcy court decisions . . . have determined that a defendant's failure to litigate after receipt of a summons with the above-quoted language amounts to the defendant's implied consent to bankruptcy court adjudication." *Moden v. Ditech Fin. LLC (In re Moden)*, No. CO-20-062, Bankr. No. 19-20343, Adv. No. 20-01085, 2021 WL 5300020, at * 5 (B.A.P. 10th Cir., Nov. 12, 2021);[3] *see also Milazzo v. Techakraisri (In re Old DDUS, Inc.),* 659 B.R. 810, 834 (Bankr. S.D.N.Y. 2024) (many courts considering whether default constitutes implied consent have held that "failure to appear, despite a valid service of process, constituted a voluntary and knowing consent to the bankruptcy court's issuance of a final judgment by default"). The language in the Shellpoint summons is identical to that in the *Milazzo* case. And, the *Milazzo* court noted that the "language could not have been clearer." *Id.*

### *II. Factual and Procedural Background*

Prior to the bankruptcy filing, Taplin's residence was damaged by a fire. Adv. Dkt. No. 1. Although the insurance proceeds paid the mortgage in full, Shellpoint, Taplin's mortgage servicer, did not apply the funds to his account and continued to pursue Taplin for the full amount of the loan, even after Taplin's attorney informed Shellpoint of their error. Shellpoint twice attempted to foreclose, ultimately forcing Taplin to file bankruptcy for no other reason than to stop foreclosure

[2] This language is expressly stated in the official Bankruptcy Form 2500A (Rev. 12/15) for Summons in an Adversary Proceeding, available on the court's website at https://www.uscourts.gov/forms-rules/forms/summons-adversary-proceeding-0.

[3] This unpublished opinion may be cited for its persuasive value. *In re Moden*, 2021 WL 5300020, at *1 n.1.

on his home. Taplin requests actual, compensatory, and punitive damages in amounts to be determined by the Court, as well as attorney's fees and expenses. *See* Adv. Dkt. No. 1 at 5, Adv. Dkt. No. 12, Adv. Dkt. No. 29. The following is a chronology of events leading to Taplin's bankruptcy filing.[4]

1. On May 6, 2003, Taplin executed a Note and Deed of Trust in favor of Citizens Bank in the amount of $120,000, secured by Taplin's residence in McComb, Mississippi. Adv. Dkt. No. 1-3. At some point, the Deed of Trust was assigned to Shellpoint.[5] Adv. Dkt. No. 1-3 at 14.
2. On November 23, 2020, Taplin's residence was damaged by fire. Adv. Dkt. No. 1 at 2.
3. On January 7, 2021, USAA issued a check to Nationstar Mortgage, LLC,[6] presumably the loss payee and secured lender on Taplin's home, for $60,240.53, the full amount of the debt. *Id.*; Adv. Dkt. No. 1-1 at 1.
4. On February 11, 2021, Taplin was informed by Mr. Cooper that the check was declined because the mortgage loan was transferred to a new servicer. Adv. Dkt. No. 1 at 2.

---

[4] The factual background is largely taken from unrefuted allegations in the complaint. Adv. Dkt. No. 1.

[5] The Deed of Trust reflects that it was assigned to Mortgage Electronic Registration Systems ("MERS") in 2020. Adv. Dkt. No. 1-3 at 15. When "the deed of trust names MERS as the nominee for the lender and its successor and assigns and the deed of trust is recorded in the local real-property records with MERS as the named beneficiary, MERS remains the mortgagee of record if the note is transferred between MERS members, and there is no requirement that the deed of trust be re-recorded each time it is transferred." *Countrywide Home Loans, Inc. v. Chase Home Fin., LLC (In Re Cowin)*, 492 B.R. 858, 890 (Bankr. S.D. Tex. 2013) (quoting *Campbell v. Mortg. Elec. Registration Sys., Inc.*, No. 03-11-00429-CV, 2012 WL 1839357, at *4 (Tex. Ct. App. Sept. 14, 2012)). The documents produced in this case reflect that the mortgage and deed of trust were assigned on multiple occasions. (Note assigned to ABN AMRO Mortgage Group, Inc., on May 6, 2003, Adv. Dkt. No. 1-3 at 3; Deed of Trust assigned to MERS on April 16, 2020, *Id.* at 15; assignment to Nationstar Mortgage, LLC/Mr. Cooper, Adv. Dkt. No. 1-1 at 1-2; assignment to NewRez LLC/Shellpoint, Adv. Dkt. No. 1-2.).

[6] Apparently, Nationstar does business as Mr. Cooper. *See Wigington v. Nationstar Mortg. LLC (In re Wigington)*, No. 18-42230, 2020 WL 6877451, at *1 (Bankr. E.D. Tex. Aug. 10, 2020); Phil Hall, *Bye Bye Nationstar, Hello Mr.* Cooper, Nat. Mortg. Pro. (Aug. 21, 2017), https://nationalmortgageprofessional.com/news/64105/nationstar-hello-cooper ("After 23 years in business, Nationstar Mortgage has changed its name to Mr. Cooper.").

5. On or around April 21, 2021, Taplin received a new check in the amount of $60,240.53 from USAA and mailed the endorsed check to the new loan servicer, Shellpoint, on April 28. *Id.*

6. On May 8, 2021, the new check was received by Shellpoint. *Id.* The check cleared Shellpoint's bank on June 2, 2021. *Id.*

7. After the payoff check cleared, Shellpoint continued to send correspondence to Taplin stating that his loan was in default and threatening foreclosure. *Id.*

8. On April 5, 2022, Taplin's attorney notified Shellpoint that the mortgage loan had been paid in full and requested correction of their error. *Id.* at 3.

9. Also in 2022, Taplin received a foreclosure notice from Shellpoint. *Id.* After Taplin's attorney intervened, the foreclosure was cancelled. *Id.*

10. In 2024, Shellpoint again initiated foreclosure proceedings on Taplin's residence and scheduled a foreclosure sale date of March 8, 2024. *Id.* Shellpoint refused to cancel the foreclosure, even after contact from Taplin's attorney. *Id.*

11. To save his home from foreclosure, Taplin was forced to file bankruptcy on March 5, 2024. *Id.*; Dkt. No. 1.

12. On May 14, 2024, Shellpoint filed a proof of claim asserting that Taplin was substantially delinquent on his loan.[7] Cl. No. 2-1.

[7] The principal balance shown on the claim was $58,551.62 with a total balance of $92,349.66. Cl. No. 2-1 at 4. Interest, fees, costs, and escrow deficiencies account for the difference. *Id.* Taplin filed an objection to the claim on May 22, 2024, requesting that it be disallowed. Dkt. No. 19. The objection was sustained on September 4, 2024. Dkt. No. 32. According to the objection, if Shellpoint had properly credited the USAA insurance settlement check of $60,240.53, the principal balance would have been paid in full and other charges would not have been incurred. Dkt. No. 19 at 3. The order sustaining the objection states that Shellpoint retained the deposited insurance funds for over three years and then filed the proof of claim without giving any credit for the retained funds. Dkt. No. 32.

13. On September 10, 2025, Taplin filed an adversary proceeding against Shellpoint, alleging breach of contract, negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress. Adv. Dkt. No. 1. Shellpoint did not answer.

14. On October 21, 2025, Taplin moved for a default judgment. Adv. Dkt. Nos. 10, 12.

15. On October 27, 2025, the Court granted default judgment against Shellpoint and in favor of Taplin. Adv. Dkt. No. 14.

16. On January 29, 2026, the Court held a damages hearing. Adv. Dkt. No. 19.

### *III. Taplin's Testimony*

At the hearing, Taplin gave compelling testimony about the financial and emotional distress he experienced because of Shellpoint's actions. At times, Taplin was visibly upset as he testified.

Taplin testified that he worked for MacMillan Bloedel for 32 years and was in the Mississippi National Guard for 22 years until his retirement. Adv. Dkt. No. 22 at 4-5. He was president of two community non-profit organizations and most proud of his food ministry that feeds over 40 people every Saturday. *Id.* at 5. He was married and had three daughters and two granddaughters.[8] *Id.* at 4-5. He testified that he and his wife "had managed to sacrifice and were on our way to [what] we thought [] was going to be a successful retirement." *Id.* at 6. They bought a home, expanding it from about 1,200 square feet to about 5,500 square feet. *Id.* As a handyman, he was able to do the work himself. *Id.* And "everything was going well." *Id.* Then, "[i]n November of 2020 we had a house fire . . . [i]t was damaged, but repairable." *Id.* Taplin had insurance with USAA and planned to rebuild. *Id.*

---

[8] By the time of the hearing, Taplin's wife had passed away. Adv. Dkt. No. 22 at 4.

As noted above, USAA sent a payoff check to Nationstar (presumably the loss-payee), but the check was returned by Mr. Cooper because the servicer had changed.[9] Adv. Dkt. No. 1 at 2. USAA sent a new check to the Taplins who endorsed the check and forwarded it to Shellpoint. A representative of Shellpoint signed for the check on May 8, 2021. *Id.* The check was deposited by Shellpoint on June 2, 2021.

Taplin testified that he did not hear from Shellpoint for two months after he sent the second check, so he contacted Shellpoint and was told that they had not seen the check. Adv. Dkt. No. 22 at 9. Taplin went to the post office and obtained a copy of the return receipt evidencing receipt of the check by Shellpoint. *Id.* He contacted USAA and was told that the check had been cashed. *Id.* "So, now USAA sent me a copy of the check that has been cashed, but [the] response when I talked to [Shellpoint] is we haven't seen it, we don't know, we don't know. This goes on for maybe two and a half, eight months." *Id.* Around November 2021, Shellpoint acknowledged that they found the check and that Taplin had overpaid and was due a refund. *Id*. at 10. Taplin said, "I was happy . . . [b]ut then nothing ever happened." *Id.*

Taplin reached out to Shellpoint again and was told he owed late fees and penalties "as if [he] had not made a payment since the house fire." *Id.* He testified that, "I'm thinking that this is taken care of . . . I . . . paid you off. We [are] good to go, but they're still charging me late fees and penalties saying that I haven't made a payment since November of 2020." *Id.* The Shellpoint representative he was talking with told him, "Mr. Taplin, I can't talk to you about this unless you got a zero balance. And I'm – what sense does this make . . . ?" *Id.* at 12-13. It was at this point that Taplin felt he was being treated unfairly and realized he needed to retain an attorney, so he hired Miller & Miller in McComb, Mississippi. *Id.* at 13. According to the Complaint, the Miller

[9] It is difficult to follow the trail of assignments because they do not appear to be recorded. Even the proof of claim filed by Shellpoint does not reflect an assignment to Shellpoint. Cl. No. 2-1.

firm sent a letter to Shellpoint on April 5, 2022, explaining that the mortgage had been paid in full and enclosing documentation. Adv. Dkt. No. 1 at 3.

Despite receipt of the payoff and contact from Taplin's attorney, Shellpoint did not correct its records and proceeded with a foreclosure action.[10] *Id.* Taplin was required to again retain counsel to stop the foreclosure. *Id.*

In 2024, Shellpoint scheduled a second foreclosure. *Id.*; Adv. Dkt. No. 22 at 18-19. It was about the time USAA was making the final payment of $150,000 to Taplin for remodeling the home. Adv. Dkt. No. 22 at 19. Taplin says he learned about the foreclosure from a member of his community that saw it in the newspaper. *Id.* at 20. Because his attorney at Miller & Miller was ill, Taplin was referred to attorney Michael Williams at Davis & Williams in Jackson, Mississippi.[11] *Id.* at 20. Taplin said that at that point he had to make a choice. *Id.*

> I could either take the money that USAA had given me to repair the house, or I could take this money and get ready for the fight of my life. So, I refused to put any more money into the house because at that point it's not clear that it's my house. So, why should I put any more money into something that they're trying to take from me anyway? . . . So, I chose to take what I had to go into battle.

*Id.* at 20-21.

After Taplin met with his new attorney, Williams, he made the choice to file bankruptcy.

> [B]ased on what I was up against, bankruptcy was recommended to me as being the avenue of getting out of this to where . . . I might have a shirt when I get it all over with because any other way I couldn't have afforded to fight. So, I was forced into bankruptcy as the only avenue of a way out.

---

[10] Taplin's testimony conflicts with the Complaint regarding how Taplin received notice of foreclosure. The Compliant states that Taplin received a Notice of Acceleration and Foreclosure. Adv. Dkt. No. 1 at 3. Taplin testified that his nephew saw the notice and told him about it. Adv. Dkt. No. 22 at 14-15. What is undisputed is that Shellpoint attempted foreclosure in 2022.

[11] Attorney Angela Miller later passed away. *Id.* at 28.

*Id.* at 21-22. Taplin testified that after the bankruptcy was filed, Shellpoint filed a proof of claim stating that he still owed them money. *Id.* at 22. "They say that the unpaid balance was like $58,000, but because of the late fees and penalties, that $58,000 had gone up to like $98,000 . . . ." *Id.*

Taplin testified that the Shellpoint problems and attempted foreclosures had an emotional toll on him and his family. *Id.* at 24. His wife, who has since died, was suffering from medical conditions including mini-strokes and paralysis. *Id.* at 4, 25. She asked him several times when they were going to go home, and he said, "I couldn't bring myself to tell her that we don't have a home to go to." *Id.* at 24. His daughter had a difficult time after the fire and sought medical help. *Id.* at 25. "So, mentally, I could use some help because it's hard to be what you look up to be when every time you try to step up and do the right thing, something . . . knock[s] you down to your knee[s]. You know, you don't have to be wrong to get wrong done to you." *Id.* He added, "I'm realizing that each and every day that just because a person is found or caught in a bad situation, it does not mean that his action made that happen." *Id.* Taplin testified that at 70 years old he lost his good credit because of the actions of Shellpoint. *Id.* at 23. He estimated that his out-of-pocket costs for filing the bankruptcy and for hiring the Miller & Miller firm were approximately $25,000. *Id.* at 24.

## ***IV. Analysis***

### ***A. Default Judgment***

The Court granted Taplin's Motion for Default Judgment on claims for breach of contract, intentional infliction of emotional distress, negligence, and negligent infliction of emotional distress. Adv. Dkt. Nos. 1, 14. Taplin requests actual and compensatory damages, punitive damages, and attorney's fees and costs.[12] Adv. Dkt. No. 1 at 5.

---

[12] Although a defendant may be liable under each of the separate claims, a plaintiff is not entitled to a double recovery. *Li v. Wooten*, No. 20-CV-8-CWR-FKB, 2021 WL 6118673, at *2 (S.D. Miss. Dec. 27, 2021). Because damages are

"A default judgment establishes the defendant's liability but not the quantity of damages." *Law Funder, L.L.C. v. Munoz*, 924 F.3d 753, 761 (5th Cir. 2019). "As a general proposition, in the context of a default judgment, unliquidated damages normally are not awarded without an evidentiary hearing." *ABC Supply Co., Inc. v. Gulf Coast Patio & Screen Inc.*, No. 25cv90-HSO-BWR, 2025 WL 2735592, at *2 (S.D. Miss. Sept. 25, 2025) (quoting *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993)).

"[T]he plaintiff bears the burden of proof as to the amount of damages." *J.K. v. R.K.*, 30 So. 3d 290, 299 (Miss. 2009). But " a party will not be permitted to escape liability because of the lack of a perfect measure of damages his wrong has caused." *Id.* (quoting *Aqua-Culture Techs., Ltd. v. Holly*, 677 So. 2d 171, 184 (Miss. 1996)).

***B. Breach of Contract***

"Under Mississippi law, '[t]he deed of trust itself is a contract between the parties,' and it is [the Court's] duty to enforce the parties' contract according to its terms." *Soffra v. Shieldsboro Dev., Inc.*, 314 So. 3d 129, 141 (Miss. Ct. App. 2020) (citing *Wilczinski v. Watson*, 69 So. 1009, 1010-11 (1915)). The Deed of Trust on Taplin's home expressly requires the lender to release the lien upon payment of all sums secured.[13] Adv. Dkt. No. 1-3 at 11. In his complaint, Taplin alleged that Shellpoint "breached the terms of the contract by its failure to credit the plaintiff's account for payment in full that the defendant had already received, misapplying funds, miscalculating payments, and failure to adhere to proper procedures . . . and by institut[ing] foreclosure when it had no legal or contractual basis to do so." Adv. Dkt. No. 1 at 3-4. Since Shellpoint failed to answer

---

awarded for intentional infliction of emotional distress, it is not necessary to discuss or analyze damages for the negligence counts, even though Shellpoint is liable on all counts on the default judgment.

[13] "23. Release. Upon payment of all sums secured by this Security Instrument, Lender *shall cancel* this Security Instrument." Adv. Dkt. No. 1-3 at 11 (emphasis added).

the complaint, Taplin's claim was unrefuted, and the resulting default judgment established Shellpoint's liability for breach of contract.[14]

"Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of the bargain . . . [and] put him in as good a position as he would have been in had the contract been performed." *Theobald v. Nosser*, 752 So. 2d 1036, 1042 (Miss. 1999) (quoting *J.O. Hooker & Sons, Inc. v. Roberts Cabinet Co.*, 683 So. 2d 396, 405 (Miss. 1996)). Because the debt to Shellpoint was paid in full, Taplin is entitled to cancellation of Shellpoint's security interest as required by the Deed of Trust.[15]

***C. Intentional Infliction of Emotional Distress***

"The standard for an intentional infliction of emotional distress claim is very high and focuses on the *defendant's conduct* and not the plaintiff's emotional condition." *Adams ex rel. M.A. v. Pascagoula Gautier Sch. Dist*., No. 25-CV-040-LG-BWR, 2026 WL 800179, at *7 (S.D. Miss. Mar. 23, 2026) (citation modified). "A claim for intentional infliction of emotional distress requires conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Magee v. Fast Pace Med. Clinic, PLLC*, No. 23-cv-199-TBM-RPM, 2025 WL 1984073, at *4 (S.D. Miss. Mar. 31, 2025) (quoting *Bowden v. Young*, 120 So. 3d 971, 980 (Miss. 2013)). "If there is outrageous conduct, no injury is required for the recovery of infliction of emotional distress or mental anguish." *Wilson v. Gen. Motors Acceptance Corp.*, 883 So. 2d 56, 65 (Miss. 2004) (quoting *Gamble ex rel. Gamble v. Dollar Gen. Corp.*, 852 So. 2d 5, 11 (Miss. 2003)). "The nature of the

---

[14] Breach of contract is established by two elements: "(1) the existence of a valid and binding contract, and (2) a showing that the defendant has broken, or breached it." *Gulf Coast Hospice LLC v. LHC Grp. Inc.*, 273 So. 3d 721, 743 (Miss. 2019) (citation modified).

[15] At the time of the damages hearing, the lien on Taplin's home had not been cancelled. Adv. Dkt. No. 22 at 29-30.

act itself, rather than the seriousness of the consequences, can justify an award for compensatory damages." *Id.* The default judgment establishes liability on Taplin's claim for intentional infliction of emotional distress.

The Court need not examine the exact injury caused to Taplin by Shellpoint's outrageous conduct to award damages. *Parsons v. Walters*, 297 So. 3d 250, 258-59 (Miss. 2020) ("Damages for emotional distress alleged in connection with intentional tortious conduct may be recovered, even when the plaintiff has experienced no physical injury."). Instead, the Court turns to the nature of the acts. Taplin said it best in his brief:

> Shellpoint's conduct was outrageous. Despite receiving a payoff check for $60,240.53 in May 2021 – which was deposited and cleared the defendant's bank – the defendant engaged in a multi-year campaign of harassment. This included mailing default notices, threatening foreclosure, and eventually instituting foreclosure proceedings twice (in 2022 and 2024). Shellpoint's prolonged, systematic disregard for the truth and the plaintiff's property rights constitute the wanton, grossly careless, indifferent, and reckless conduct required [for] Intentional Infliction of Emotional Distress.

Adv. Dkt. No. 29 at 2.

After his house was damaged by fire, Taplin did everything right—he timely filed an insurance claim and sent the proceeds to Shellpoint. Shellpoint received the proceeds, failed to credit Taplin's account, then attempted to foreclose on his property. Shellpoint was informed of its mistake but attempted yet another foreclosure. Taplin had already suffered fire damage to his home, his wife was ill, and then he faced not one but two foreclosure attempts. The first foreclosure attempt may have been excusable had Shellpoint acknowledged its mistake and corrected Taplin's account balance. Instead, Shellpoint ignored Taplin's pleas and has refused to correct its mistakes for over five years. Shellpoint doubled down and initiated a second foreclosure action forcing Taplin into an otherwise unnecessary bankruptcy and damaging his credit, and then filed an

inaccurate proof of claim in Taplin's bankruptcy case.[16] This behavior is outrageous and inexcusable. *Parsons v. Walters*, 297 So. 3d at 259 (standard for emotional distress in connection with intentional tortious conduct "considers whether the 'defendant's behavior is malicious, intentional, willful, wanton, grossly careless, indifferent or reckless.'"); *McGinnis v. Am. Home Mortg. Servicing*, 817 F.3d 1241 (11th Cir. 2016) ("Continuous unnecessary harassment over a nearly two-year period by a company whose main business is servicing such mortgages . . . might easily be viewed as extreme and outrageous conduct under the circumstances." (quoting *Margita v. Diamond Mortg. Corp.*, 406 N.W.2d 268, 272 (1987))). Compensatory damages of $10,000 are warranted.

***D. Punitive Damages***

Under Mississippi law, awarding punitive damages requires clear and convincing evidence that the defendant "acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss. Code Ann. § 11-1-65(1)(a). "There must be ruthless disregard for the rights of others, so as to take the case out of the ordinary rule." *Gamble*, 852 So. 2d at 15. Shellpoint's conduct meets that standard.

Punitive damages are an "extraordinary remedy" allowed "with caution and within narrow limits." *Cmty. Bank v. Courtney*, 884 So. 2d 767, 777 (Miss. 2004). The following factors are to be considered:

> the defendant's financial condition and net worth; the nature and reprehensibility of the defendant's wrongdoing, for example, the impact of the defendant's conduct on the plaintiff, or the relationship of the defendant to the plaintiff; the defendant's awareness of the amount of harm being caused and the defendant's motivation in causing such harm; the duration of the defendant's misconduct and whether the defendant attempted to conceal such misconduct; and any other circumstances

[16] Filing a proof of claim on a debt that has been paid may amount to bad faith resulting in sanctions. *See NexPoint Real Est. Partners v. Highland Cap. Mgmt. LP (In re Highland Cap. Mgmt., LP)*, No. 25-11185, 2026 WL 2730275, at *5-6 (5th Cir. Sept. 16, 2026) ("[a] bankruptcy court . . . [may] properly invoke[] its inherent sanction power" if a proof of claim is filed or litigated in bad faith).

> shown by the evidence that bear on determining a proper amount of punitive damages.

Miss. Code Ann. § 11-1-65(1)(e).

"The decisive question is whether punitive damages would accomplish the statutory purposes of punishment and deterrence of future misconduct." *Robertson v. Murray (In re Murray)*, Adv. No. 20-00032-KMS, 2023 WL 310344 at *7 (Bankr. S.D. Miss. Jan. 18, 2023) (citing Miss. Code Ann. § 11-1-65(1)(f)(i) (providing that award must be "rationally related to the purpose to punish what occurred . . . and to deter its repetition by the defendant and others")). Taplin argued the following in the post-hearing brief:

> [Shellpoint]'s actions were not a mere accounting "glitch." Filing a proof of claim in a federal bankruptcy proceeding for a debt known to be satisfied demonstrates a "wanton and reckless" disregard for judicial integrity and the plaintiff's rights. Punitive damages are warranted here to deter similar conduct by mortgage servicers who fail to implement adequate compliance controls and ignore direct evidence of account satisfaction, causing irreparable harm to consumers.

Adv. Dkt. No. 29 at 3. Taplin continued, stating that "[t]he evidence demonstrates that Shellpoint's actions were not merely negligent but rose to the level of wanton, grossly careless, indifferent or reckless." *Id.*

Punitive damages are proper in this case to deter Shellpoint from repeating its behavior. Shellpoint is a large company that regularly services mortgage loans such as Taplin's. Undoubtedly, Shellpoint routinely deals with insurance proceeds and procedures for properly crediting borrower's accounts. The record establishes that Shellpoint was made aware that Taplin's account had been paid in full but still chose to pursue foreclosure twice. Taplin was forced to file an otherwise unneeded bankruptcy to stop Shellpoint. Even then, Shellpoint filed a wholly inaccurate proof of claim in Taplin's bankruptcy case.

At worst, for over five years, Shellpoint knowingly and willfully attempted to collect a debt and foreclose on Taplin's home despite being paid in full. At the very least, Shellpoint was grossly

negligent in failing to verify whether they had received payment, especially after being contacted by Taplin's attorneys on several occasions. Regardless, punitive damages are warranted to deter this behavior in the future. The Court finds Taplin is entitled to $25,000 in punitive damages.

***E. Attorney's Fees***

In Mississippi, "[a] judge may award attorney's fees collaterally only if statutorily or contractually authorized, or if punitive damages are also awarded." *Fulton v. Miss. Farm Bureau Cas. Ins. Co.*, 105 So. 3d 284, 287 (Miss. 2012); *see also Wiemer v. Rubino*, No. 16CV99-LG-RHW, 2019 WL 187873, at *12-13 (S.D. Miss. Jan. 14, 2019) (attorney's fees may not be awarded to prevailing party unless a statute or contract provides, but under Mississippi law attorney's fees may be allowed if punitive damages are warranted). Here, the Deed of Trust does not authorize attorney's fees to Taplin in the event of a breach. But the award of attorney's fees is proper because punitive damages were awarded.

Taplin's counsel submitted a fee statement itemizing forty-nine hours of service at a rate of $300.00 per hour for a total of $14,700.00. Adv. Dkt. No. 29-1. Services included drafting an objection to proof of claim, attending hearings, drafting the adversary proceeding and motion for default judgment, and drafting a damages memorandum. *Id.* Taplin's attorney spent sixteen hours researching and drafting his memorandum of law in support of damages. *See* Adv. Dkt. No. 29. The Court finds this time to be unreasonable, given the document is three pages long and contains only three case cites. The Court finds that eight hours is reasonable for this service reducing the total number of hours to forty-one. With this adjustment, the Court awards Taplin $12,300.00 for attorney's fees and costs.

### *V. Conclusion and Order*

**IT IS THEREFORE ORDERED AND ADJUDGED** that Taplin is awarded damages from Shellpoint for actual damages for intentional infliction of emotional distress of $10,000.00, punitive damages of $25,000.00 and attorney's fees of $12,300.00, for a total award of $47,300.00. A separate final judgment will be entered.

**IT IS FURTHER ORDERED AND ADJUDGED** that the debt owed by Taplin to Shellpoint is paid in full and the Deed of Trust is cancelled.

*##END OF ORDER##*